IN THE DISTRICT COURT OF MUSKOGEE COUNTY
STATE OF OKLAHOMA

| | |
|---|---|
| SHELLI M. HOPKINS, an individual, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. CJ-16-61 |
| BACONE COLLEGE, an Oklahoma ) | |
| not-for-profit institution, ) | |
| ) | |
| THE BOARD OF TRUSTEES OF ) | *ATTORNEY LIEN CLAIMED* |
| BACONE COLLEGE, ) | *JURY TRIAL DEMANDED* |
| ) | |
| FRANK WILLIS, an individual, ) | |
| ) | |
| ) | |
| Defendants. | |

## PETITION

Plaintiff Shelli M. Hopkins, by and through her counsel of record, Richardson Richardson Boudreaux, hereby files her Petition against Defendants Bacone College and Frank Willis. In furtherance thereof, Plaintiff informs the Court as follows:

### I. PARTIES, JURISDICTION, & VENUE

1. Plaintiff Shelli M. Hopkins is an individual and a resident of Muskogee County, Oklahoma.

2. Based on information and belief, Defendant Bacone College is an Oklahoma not-for-profit educational institution located in Muskogee County, Oklahoma.

3. Based on information and belief, Defendant Board of Trustees of Bacone College ("the Board") is the governing body of the not-for-profit Defendant

1

EXHIBIT 1

college. The Board delegated the day-to-day management of the college to the college president. All acts as alleged herein were done in the course and scope of the employment of the college president and/or with the Board's acquiescence.

4. Based on information and belief, Defendant Frank Willis is an individual and a resident of Muskogee County, Oklahoma. At the material time, Defendant Willis served as the interim president of Bacone College.

5. Subject matter jurisdiction is proper in this Court pursuant to Okla. Const. Art. 7, §7 (granting district courts of this state unlimited general jurisdiction over all matters sounding either in law or equity) and 12 O.S. §2004(F) (authorizing courts of this state to exercise jurisdiction on any basis consistent with the Constitutions of the United States and Oklahoma). The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00).

6. Venue is also proper in this Court as the contractual relationship between the parties as well as the conduct complained of took place in Muskogee County, Oklahoma.

## II. STATEMENT OF FACTS

7. Plaintiff hereby incorporates the previous paragraphs as though stated *verbatim* below.

8. Plaintiff, Shelli Hopkins, was employed with Bacone College on or about April of 2000. She was hired on as a Special Assistant to the College President.

9. Through an admirable work ethic and stellar performances, Ms. Hopkins worked her way up and was eventually promoted to the Assistant Vice President of Student Life & Dean of Students—a senior management position.

10. Ms. Hopkins was doing well and flourishing in her senior management position. In fact, when Bacone's new Interim President Frank Willis took charge of the school, he told Ms. Hopkins in May of 2013 that no one around here has anything bad to say about you.

11. Things, however, quickly changed come November of 2013. On or about November 15, 2013, the college president's assistant sent Ms. Hopkins an email informing her that Bacone College would be hosting a Thanksgiving dinner for students that live on campus and that Ms. Hopkins' department—Student Life/Housing—would be charged with informing the students. Ms. Hopkins did as asked.

12. While Plaintiff was engaged in preparations for the Thanksgiving dinner, unbeknownst to her, Frank Willis was also preparing to execute his own plans—plans against her. At the time, Ms. Hopkins was the only female Assistant Vice President at the time of Mr. Willis' arrival on campus; no other female senior management staff members ranked higher than her. There were, however, several males with the same title, all of whom, based on information and belief, earned a greater salary than Plaintiff throughout her employment with the college. It appears that President Willis had sinister plans to rid Bacone of Ms. Hopkins. The first sign of what appears to have been Willis' sinister plan was revealed on or about November

21, 2013. On that day, without any prior notification or input from Ms. Hopkins, a senior executive manager of college operations, President Willis made several substantial policy changes that affected the departments that Plaintiff was overseeing, simply because of her sex. Based on information and belief, President Willis did not do this to her male counter-parts.

13. More surprises soon followed. On or about November 26, 2013, Frank Willis office scheduled a meeting with department directors, including Plaintiff. At the time, Ms. Hopkins was on a prior scheduled vacation. She alerted the president's assistant that she was on vacation and asked if the college president Frank could consider rescheduling the meeting. The meeting, however, was not rescheduled and went ahead as planned with Denise Wilcox, Susie Cagle (a non member of Plaintiff's department), and Tammy McDaniel, HR Director, all in attendance.

14. During this meeting President Willis stated that he was transferring the Department of Maintenance from Ms. Hopkins to Mike McDaniel (HR Director's husband) whom he had hired as a contract employee to oversee Maintenance. This change, he said, would be effective immediately. But he was not done. President went on to say that he was making the change because maintenance would be best "overseen by a man." When one of the women in attendance, Denise Wilcox, asked the president what would happen to the other departments (such as housekeeping and grounds) that Ms. Hopkins was overseeing, President Willis said he could see keeping the housekeeping department, for example, where it previously was (under Plaintiff's supervision) because it is "more of a woman thing." As part of his swift new changes,

President Willis said that Mr. McDaniel would report for work the following Monday. The whole time, the HR Director, an obvious benefactor of the newly instituted changes (as her husband was given a new job), was sitting in the same room and never said a word.

15. During the same meeting, President Willis also said that Dustin Hopkins (Plaintiff's son) who had previously reported to her, would now have to report through Denise Wilcox in order to eliminate Dustin being a direct report to Plaintiff. That change also became effective immediately. A further policy change was that Student Life, Plaintiff's department, would now be showing R rated movies on movie nights since that is what the students wanted. This, of course, ran counter to the traditions of a college that had not traditionally shown R rated movies at Student Life sanctioned activities, being known as a college that had values contrary to those found to be in the R rated movies.

16. Meanwhile, the day of the student Thanksgiving dinner soon arrived. That day was November 27, 2013. As previously communicated and expected, Student Life (Plaintiff's department) was overseeing the event. Sometime later that evening, at approximately 6pm, however, Ms. Hopkins received a call from Joanne McClain (one of the event staff) reporting that the college president was seen drinking with the students. Underage students were present at the dinner and may have been served alcohol, as well. Also, during the course of the dinner, one male student was inappropriately touching, groping, and making sexually suggestive comments to female catering staff. The student did not stop when asked to do so. Plaintiff told the

event staff member who had reported to her that she would notify Dr. Robert Brown, Bacone College's second in command at the time. Dr. Brown advised Plaintiff to ask catering staff to contact the Campus Conduct Hotline—a misconduct-reporting tool if the matter at issue cannot be addressed to the HR department or upper management. The catering staff, did in fact, report the misconduct.

17. After the misconduct report was made, President Willis retaliated in swift and brutal way. The first victim was Joanne McClain, the catering manager. After her staff had initiated the Campus Conduct Hotline call reporting the president's conduct, she was uninvited from attending a meeting that she had previously scheduled between her regional manager, President Willis, and Plaintiff, scheduled for December 4, 2013.

18. Plaintiff was next. On or about December 6, 2013, Dr. Brown contacted Plaintiff to speak to her, as he had done with other staff members, about the president's misconduct at the Thanksgiving dinner. During this meeting, Plaintiff informed Dr. Brown that she also intended to place a call with the Campus Conduct Hotline because she felt that she had been exposed to some professional and personal liability due to the actions at the Thanksgiving dinner since her department had advertised, invited, and encouraged the students to attend the function. Additionally, Plaintiff had also received a call from a parent berating her for inviting her child to a school dinner at which alcohol was provided to students.

19. President Willis was clearly unhappy with having been reported. After the Campus Conduct Hotline call, on or about December 17, 2013, President Willis

made statements to the college's Director of External Relations, Susie Cagle, that he did not know why Plaintiff was going after him, and it was not going to end well for her. He even told her that he felt that Plaintiff "must be menopausal."

20. But his efforts went further. Throughout the month of December, President Willis spent time and energy making efforts to interview some of the witnesses to the Campus Conduct Hotline calls. President Willis apparently believed that Denise Wilcox and Plaintiff had coerced all of the catering staff to contact the hotline by noon on the following day or face losing their jobs. Furthermore, he even started telling different people, at every opportunity he had, that he believed that Plaintiff was embezzling funds. None of that, however, was true.

21. On or about January 16, 2014, President Willis, without prior notice or any consultation, officially stripped Plaintiff of control of the Grounds department and immediately assigned it to Mike McDaniel, the new male hire. Defendant Willis said he needed to make the change because things were falling in the cracks. President Willis also effected that the Director of Student Life (a department previously overseen by Plaintiff), would immediately be overseen and would report to Kindle Holderby, a much younger male director in his 20s. Mr. Holderby had zero experience as an administrator and only a few months of experience in the Student Life department. In fact, there was no previous notification or discussion with Plaintiff, considering that she was the senior management team member who previously oversaw all of these departments. Indeed, there was even no precedent at the college for one director to report to another director, as had occurred in this situation. Plaintiff

was also stripped of the Housing department, as well. All the employees who previously worked in the department with Plaintiff were immediately assigned other duties.

22. Meanwhile, while internal investigations were still ongoing, the college's Executive Committee and the Board of Trustees were fully briefed of the Campus Conduct Hotline Complaint and the president's subsequent retaliatory conduct. On or about February 11, 2014, Leroy Thompson (an Assistant Vice President of Christian Ministry and a fellow member of Bacone's management team) approached Plaintiff seeking an audience. He said he had received calls from some of the other board members, including the board chairman. Mr. Thompson went on to serve up a lengthy sermon encouraging Plaintiff to "show more Christian maturity" in resolution of the issues between the college president and herself. Mr. Thompson even quoted scripture to Plaintiff about the need for her to turn the other cheek. He further inquired of Plaintiff if she had already filed a lawsuit. Again, he quoted scripture to her about the inappropriateness of Christians filing lawsuits against one another.

23. In March of 2014, Ken Adams of the college's Executive Committee informed Plaintiff that college was going to act on the Compass Conduct Hotline Complaint. But the college did nothing about the specific complaints and the president's subsequent retaliatory conduct. In fact, Mr. Adams had told Plaintiff that he would meet with her on March 20, 2014 to discuss these ongoing issues, but no such meeting ever took place, nor was it ever rescheduled.

24. By May of 2014, Plaintiff's reporting responsibility had been changed from directly reporting to the college president to Dr. Brown, Bacone's second in command---a step down. Indeed, president Willis even specially designated a person in the Student Life Department to monitor Plaintiff's time. As a result of the changes, Plaintiff would now be reporting to Dr. Brown and assisting him as needed. At around this time, Plaintiff also became aware that all throughout her time at the college, even though the conditions under which Plaintiff and her male counterparts performed their respective work were basically the same, every male member of the management team (who were approximately 7 males) were paid more, while she was paid less because of her sex, among other unstated factors.

25. Matters came to a head on or about July 11, 2014. That day, Plaintiff had previously scheduled a vacation day with permission of Dr. Brown, so that she could take her mother for chemotherapy treatment. Regardless, Plaintiff received a call at around 8:45 am from the president's office asking her to come in by 9am for an impromptu meeting. The president's assistant was insistent that Plaintiff still come in for the meeting, even though she had explained her previously set appointment. Plaintiff arrived there about 10 am. Robbie Duncan, the president's legal counsel was present and stated he would be recording the meeting for note-taking purposes.

26. That day, the college president told Plaintiff that she was being asked to resign or be terminated and that he wanted to do that effective immediately. In a nutshell, he said he had lost confidence in her ability to effectively manage and exercise judgment. Indeed, President Willis told that her that she "might have been

effective once, but you're not anymore." When Plaintiff heard President Willis' words, she felt a gut wrenching pain. She immediately started having feelings of emptiness, humiliation, and feeling depressed. She started asking herself in her mind, "I am not relevant anymore?" After leaving the meeting, Plaintiff felt very confused: telling herself, "I was doing the right thing, how can he get away with this?" She quickly broke into tears. She cried, and cried some more. That night, and many nights afterwards, she sat up failing to sleep. Plaintiff even sought counseling from the elders at her church, to help her cope with the situation.

27. That same day, Plaintiff learned that Denise Wilcox was also terminated. Furthermore, Susie Cagle was officially terminated on or about August 1, 2014. All three ladies had lodged complaints about the president's conduct, some for what happened at the Thanksgiving party, while others complained about his sexually harassing remarks aimed at Plaintiff, at the December 2013 staff meeting, *supra* ¶¶ 11-15.

28. Despite numerous attempts to secure other employment after Bacone, Plaintiff finds herself unable to—her name, marred by deliberate falsehoods, is tainted.

29. Plaintiff timely filed a charge of discrimination with the Oklahoma office of the United States Equal Employment Opportunity Commission ("EEOC") in September of 2014. The EEOC issued a "Right to Sue Letter" on December 17, 2015. As such, this suit is timely.

## III. CAUSES OF ACTION

### First Cause of Action: Title VII Sexual Harassment (Hostile Working Environment)
### 42 U.S.C. §2000e-2(a)
### (Against All Defendants)

30. Plaintiff hereby incorporates the preceding paragraphs *verbatim*, as though stated below.

31. Plaintiff Shelli M. Hopkins, was at the material time an employee of Bacone College in Muskogee County, Oklahoma. As such, she had an employment relationship with Defendants named herein. Plaintiff was also well qualified for her position(s).

32. Plaintiff Shelli Hopkins is a member of a Title VII, 42 U.S.C. §2000e-2 protected class—a woman.

33. During her time of employment with Bacone College, and for a period between November 2013 all the way through July of 2014, Plaintiff was continually subjected to sexual harassment that resulted in adverse employment action (including, but not limited to, demotion resulting in a significant change in duties and prestige) by her supervisor, the college president, because she, among other unstated reasons, was a woman. The severity, perversity, and longevity of the sexual discriminatory treatment directed at Plaintiff culminated in both a hostile working environment, and ultimately, her sex was also a motivating factor for her suffering the ultimate adverse employment action—termination.

34. During this entire ordeal, Plaintiff perceived her work environment to be abusive.

35. As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff was humiliated and had her rights violated.

36. Plaintiff now seeks redress from this Court for those wrongs and injuries in the form of damages and attorney's fees.

### Second Cause of Action: Title VII Sexual Harassment (Retaliation)
### 42 U.S.C. §2000e-3(a)
### (Against All Defendants)

37. Plaintiff hereby incorporates the preceding paragraphs *verbatim*, as though stated below.

38. Plaintiff Shelli M. Hopkins, was at the material time an employee of Bacone College in Muskogee County, Oklahoma. As such, she had an employment relationship with Defendants named herein. Plaintiff was also well qualified for her position(s).

39. Plaintiff Shelli Hopkins is a member of a Title VII, 42 U.S.C. §2000e-2 protected class—female. In fact, she was well qualified for her position(s).

40. While in the employ of Defendants, Plaintiff was engaged in protected activity—she reported acts of sexual harassment on two female catering staff perpetrated by a male student at a school sponsored event, and additionally, she also reported continued acts of sexual harassment directed toward her by the college president—both through the Campus Conduct Hotline and to Dr. Brown (Bacone's second in command).

41. After lodging her complaints, Plaintiff was subjected to adverse employment action (including, but not limited to, demotion resulting in a significant change in duties and prestige) and ultimately termination by her supervisor, the college president.

42. During this entire ordeal, Plaintiff perceived her work environment to be abusive.

43. The adverse employment action was unjustified and lacked proper legal basis.

44. The circumstances as stated in this instrument permit an inference of a causal connection between the two events (protected activity and adverse employment action).

45. As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff was humiliated and had her rights violated.

46. Plaintiff now seeks redress from this Court for those wrongs and injuries in the form of damages and attorney's fees.

### Third Cause of Action: Age Discrimination
### 29 U.S.C. §623, Age Discrimination in Employment Act (ADEA)
### (Against All Defendants)

47. Plaintiff hereby incorporates the preceding paragraphs *verbatim* as though stated below.

48. Plaintiff Shelli M. Hopkins, was at the material time an employee of Bacone College in Muskogee County, Oklahoma. As such, she had an employment

relationship with Defendants named herein. Plaintiff was also well qualified for her position(s).

49. At the material time, Plaintiff was above 40 years old, as such, she was an ADEA protected class member.

50. Plaintiff was treated less favorably than others not in the protected class (namely employees younger and less than 40 years old). Aside the fact that she reported instances of unlawful employment practices by the employer, her age was also a motivating factor for her disparate treatment, which resulted in adverse employment action.

51. As a proximate and direct result, Plaintiff was demoted and stripped of her responsibilities. In fact, her responsibilities were transferred to a male of much younger age (who was not in the protected class).

52. As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff was humiliated and had her rights violated.

53. Plaintiff now seeks redress from this Court for those wrongs and injuries in the form of damages and attorney's fees.

### Fourth Cause of Action: Equal Pay Violations
### 42 U.S.C. §2000e-2(a) & 29 U.S.C. §206
### (Against All Defendants)

54. Plaintiff hereby incorporates the preceding paragraphs *verbatim* as though stated below.

55. Plaintiff Shelli M. Hopkins, was at the material time an employee of Bacone College in Muskogee County, Oklahoma. As such, she had an employment

relationship with Defendants named herein. Plaintiff was also well qualified for her position(s).

56. Plaintiff Shelli Hopkins is a member of a Title VII, 42 U.S.C. §2000e-2 protected class—female.

57. Plaintiff was performing work that was substantially equal to that of the male employees who worked with her considering the skills, duties, supervision, effort and responsibilities of the jobs.

58. Throughout her employment with Defendants, and even though the conditions under which Plaintiff and her male counterparts performed their respective work were basically the same, every male member of the management team (who were approximately 7 males) were paid more, while she was paid less because of her sex, among other unstated reasons.

59. As a direct and proximate result of Defendants' wrongful conduct as alleged herein, Plaintiff was humiliated and had her rights violated.

60. Plaintiff now seeks redress from this Court for those wrongs and injuries in the form of damages and attorney's fees.

### Fifth Cause of Action: False Light
### (Against All Defendants)

61. Plaintiff hereby incorporates the preceding paragraphs *verbatim* as though stated below.

62. Defendants gave and continued to give publicity to a matter placing Plaintiff before the public in a false light until when she was terminated in July of

2014 (essentially alleging that Plaintiff must have been embezzling funds and that is possibly why she had reported President Willis).

63. The false light portrayed by Defendants would be highly offensive to any reasonable person under the circumstances.

64. Defendants had and continue to have knowledge of, and/or acted and continue to act in reckless disregard as to the falsity of the publicized matter and the false light.

65. As a result of Defendants' acts in portraying Plaintiff before the public in a false light, Plaintiff has and continues to sustain damages.

### Sixth Cause of Action: Intentional Infliction of Emotional Distress
### (Against the Individual Defendants)

66. Plaintiff hereby incorporates all the preceding paragraphs in their entirety as though stated below *verbatim*.

67. Defendants' actions constitute an intentional, wanton, and reckless disregard for the safety, health and well-being of Plaintiff.

68. Defendants' actions were so extreme and outrageous as to go beyond all possible bounds of decency and would be considered atrocious and utterly intolerable in a civilized society.

69. Defendants' actions intentionally or recklessly caused severe emotional distress to Plaintiff, beyond that which reasonable people should be expected to endure.

70.  As a direct result of Defendants' actions, Plaintiff has suffered damages in an amount in excess of $10,000.

**PUNITIVE DAMAGES**
**For All Claims**
**(Against All Defendants)**

71.  Plaintiff hereby incorporates all the preceding paragraphs in their entirety as though stated below *verbatim*.

72.  The acts and omissions by Defendants as set forth in the preceding paragraphs, demonstrate that Defendants were engaged in conduct and/ or practices evincing malice or reckless indifference to Plaintiff's rights.

73.  As a direct result of Defendants' malice and/or reckless disregard for Plaintiff's rights, Plaintiff is entitled to exemplary and punitive damages in an amount to be determined at trial commensurate with the financial resources available to Defendants and sufficient to deter others similarly situated from like behavior.

**IV. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court grant judgment in her favor against Defendants for the causes of action alleged herein in an amount in excess of $75,000, exemplary and punitive damages, attorney's fees, costs, pre-and-post judgment interest, and for such further relief as the Court deems just and proper.

Respectfully submitted,

**RICHARDSON RICHARDSON BOUDREAUX**

*/s/ Gary L. Richardson*
---
Gary L. Richardson, OBA No. 7547
Charles L. Richardson, OBA No. 13388
Raymond S. Allred, OBA No. 11747
Mbilike Mwafulirwa, OBA No. 31164
7447 S. Lewis Ave.
Tulsa, Oklahoma 74136
(918) 492-7674 (Tel); (918) 493-1925 fax
***Attorneys for Plaintiffs***